

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WEIGEL BROADCASTING CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 06 C 1490 |
| | ) |
| TV-49, INC., a Wisconsin corporation, | ) |
| and JOEL J. KINLOW SR., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Weigel Broadcasting Co., an Illinois company, filed this complaint in the Circuit Court of Cook County, 06-CH-03246, against defendants TV-40. Inc. a Wisconsin corporation, and Joel J. Kinlow Sr. (collectively TV-49), alleging breach of contract for the sale of a television station. Defendants removed the case to this court, invoking diversity jurisdiction under 28 U.S.C. §§1441 and 1446. After limited discovery, defendants filed a motion to stay discovery pending the determination of a motion for summary judgment. The motion to stay discovery was granted. Presently before this court is defendants' motion for summary judgment, which we grant in part and deny in part.

## BACKGROUND

Defendant TV-49 is a small television station based out of Racine, Wisconsin, whose stock is wholly-owned by defendant Joel Kinlow. On May 18, 2005, an offer was made for the purchase of TV-49 by plaintiff, Weigel Broadcasting Company, an Illinois company engaged in the operation of broadcast television stations (plf. cplt., exh. A). The offer stated that Weigel was interested in acquiring TV-49, including all licenses, authorizations, applications and

equipment, including towers and buildings, for $5,000,000 in cash. Plaintiff stated that it was subject to FCC and other regulatory approval, as well as the terms of a customary definitive purchase agreement. It further stated that the purchase agreement would be completed within 40 days from the date of the letter, and the FCC applications would be filed within five days thereafter. The offer then stated that if the terms of the offer were acceptable to defendants, Weigel would place $250,000 in escrow and deposit another $250,000 after the signing of a purchase agreement. The offer was to be held open for ten days and required TV-49, within that time, to agree to the letter and provide written assurance that it had terminated negotiations to sell the station to another party and would not entertain any similar negotiations pending the completion of a definitive purchase agreement.

On July 7, 2005, long after the plaintiff's offer had expired, defendants sent a letter to plaintiff regarding the possible sale of the station:

"Mr. Norman H. Shapiro
26 N. Halsted Street
Chicago, IL 60661

July 7, 2005

Dear Mr. Shapiro:

I am writing this letter as President of TV-49, Inc. to provide written assurance of the basis upon which I am prepared to sell the stock of TV-49, Inc. to Weigel Broadcasting Company.

TV-49 Inc. is the owner of all licenses, authorizations (including construction permits), applications and equipment (excluding tower and real estate) of and related to WJJA-TV and WJJA-DT.

This non-binding Letter of Intent represents the fundamental terms and conditions upon which I am prepared to enter into a Stock Purchase Agreement (SPA) with Weigel Broadcasting Company for the stock of TV-49 Inc:

Purchase Price:
The purchase price for all of the outstanding stock of TV-49, Inc. shall be seven million dollars ($7,000,000.00), payable as follows:

- $5.5 million dollars ($5,500,000.00) payable in cash, at closing

- $1.5 million dollars ($1,500,000.00), which will be placed in an escrow account and paid in increments of two hundred fifty thousand dollars ($250,000) per year for six years, with any

>       unpaid balance becoming due and payable upon move of WJJA-TV's antennae to Weigel
>       Broadcasting Company's Milwaukee tower (or equivalent).
>
> Deposit:
> Weigel Broadcasting Company will deposit $250,000.00 into an escrow account, as a good faith deposit
> pending signing of an SPA and upon such signing will add an additional $250,000.00 to secure your
> performance under the SPA.
>
> Timing:
> Parties agree to immediately proceed with the preparation of a definitive SPA to-be completed and
> executed within 40 days hereof (7/13/05). The FCC applications will be filed within 5 days thereafter.
>
> TV-49, Inc. will continue to have the rights to lease space on the tower owned by Mr. Kinlow at a
> nominal fee ($1.00 per annum) until the earlier of the following: (a) WJJA's antennae are moved to
> Milwaukee, or (b) 20 years from the date of closing.
>
> Should the above terms be acceptable to Weigel, and indicated as such by executing this document, TV-
> 49 Inc., it's [sic] owner and representatives will cease all negotiations to sell to any other party and will
> not enter into or entertain any such similar negotiations pending completion of a definitive and binding
> SPA with Weigel.
>
> I look forward to working with Weigel on concluding a quick, clean, and mutually beneficial transaction
> and appreciate the time, effort, and money, which Weigel has already committed to this transaction.
>
>                                         Sincerely,
>                (signed)                 Joel J. Kinlow Sr.
>                                         Joel J. Kinlow Sr.
>                                         President
>
> Accepted By:
> (initialed and signed: <u>NHW</u>
>                 Norman H. Shapiro
>                 President
>                 Weigel Broadcasting Company"
>
> (plf.cplt., exh. B).[1]

On July 13, 2005, both parties signed the letter of intent, with the modifications that the right to lease the TV tower would extend for 20 years after closing, and that the 40-day period for the execution of the SPA would begin on July 13, 2005, instead of July 7, 2005 (plf.cplt., exh. C).

After the letter of intent was signed, plaintiff requested of defendants certain

---

[1] In their response to plaintiff's additional statement of facts, defendants make several objections to plaintiff's frequent use of the term "good faith" to describe the $250,000 deposit into escrow pursuant to the letter of intent (def. resp. to plf's add. stmt of facts at ¶¶5, 9). They claim that "neither the Letter of Intent nor the Escrow Agreement contain this term"(*Id.* at ¶9). However, this term is clearly set forth in defendants' self-characterized "10 line" letter of intent to describe the escrow deposit and we do not appreciate such a blatant misstatement of the facts.

documents to aid in its investigation of the station, which defendants agreed to provide, but it is unclear whether they did in fact do so.

On August 11, 2005, plaintiff sent defendant a draft of the escrow agreement (plf's resp. in opp. to motion, exh. I), which referred to the letter of intent as "non-binding," and on August 17, 2005, six days before August 23, 2005, the expiration of the 40-day period for the execution of the SPA, plaintiff provided defendants with a 70-page draft SPA, with the caveat that it had not yet been reviewed by plaintiff's counsel and therefore was subject to revision (plf's resp., exh. H). The draft SPA included all the provisions normally found in a contract of this type, including warranties, indemnities, terms for the release of money in escrow, closing procedures, licensing and notice requirements, a confidentiality and liquidated damages clause. It also included a provision requiring TV-49 to make a channel election with the FCC, demanding its right to be carried on cable channel 49 – it was currently being carried on channel 19. It also stated, in section 1.1, that the "purchase price" was $5.5 million. (*Id.*)

The 40-day mark passed and no definitive SPA had been executed. On September 1, 2005, when counsel for defendants returned the escrow agreement signed by defendant Kinlow, it stated it had not yet completed review of the 70-page draft SPA (plf's resp., exh. M). On September 6, 2005, plaintiff deposited the $250,000 into escrow with its attorney, and forwarded a copy of the executed escrow agreement and verification of payment to defendants (plf's resp., exh. N). On September 20, 2005, counsel for defendants e-mailed plaintiff a list of over 30 concerns they had with the draft SPA (defts' stmt of undisputed facts, exh. C). These concerns, included the purchase price, the $25,000 liquidated damages clause, and the requirement for channel election, The channel election, which needed to be completed by

October 1, 2005, a time before the sale realistically would close.[2]

On September 22, 2005, counsel for plaintiff wrote to defendants regarding their comments, stating that "[w]ith respect to the comments you have already provided, we would anticipate that all outstanding issues could be resolved by good faith negotiations within a very short time frame" (defts' stmt of undisputed facts, exh. D). However, counsel for plaintiff went on to state that plaintiff was concerned that defendants would not be willing to make the necessary channel election, which it claimed "has been from the outset a fundamental component of this transaction from my client's standpoint." (*Id.*) Counsel further stated that "[i]f your client is unwilling to make the necessary election, however, my client has no further interest in pursuing this matter." (*Id.*)

On October 1, 2005, defendants made the channel election, electing to remain on channel 19 and not moving to channel 49, as plaintiff requested (plf's resp., exhs. W and X). Counsel for defendants informed plaintiff of this election on October 4, 2005, and the next day notified plaintiff that TV-49 had begun discussions with other parties and had received a draft letter of intent from a third party, Entravision (plf's response, ¶21). Plaintiff attempted, unsuccessfully, to re-ignite negotiations with defendants in November (plf's response, exhs. Y and Z). On January 12, 2006, TV-49 signed a letter of intent with Entravision for the purchase of the station.

Plaintiff subsequently filed this action for breach of contract, alleging that the letter of intent was a binding contract requiring the parties to negotiate exclusively and in good faith towards the SPA. Further, it alleges that defendants breached this contract when they failed

---

[2]Specifically regarding the channel election, counsel for defendants stated that "Mr. Kinlow does not want to be on Channel 49 if this transaction does not close." *Id.*

to respond to the draft until September 20, 2005, did not provide further comments on the draft, and entertained an offer by Entravision. Plaintiff alleges that the letter of intent is sufficiently definite to allow for the remedy of specific performance, or in the alternative, that plaintiff is entitled to damages. After prevailing on a motion to stay discovery, defendants filed a motion for summary judgment claiming that the letter of intent is not binding by its very terms, and therefore gives rise to no obligations or duties on either party, including the duty to negotiate exclusively and in good faith.

## ANALYSIS

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We draw all inferences and view all admissible evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The parties do not dispute that Illinois law governs this diversity action. *See* Erie R.R. Co. v. Tomkins, 304 U.S. 64 (1938); Ocean Atlantic Development Corp. v. Aurora Christian Schools, Inc., 322 F.3d 983, 995 (7th Cir. 2002).

### Letter of Intent as a Binding Contract

To determine whether summary judgment is appropriate here, we must determine if the letter of intent the parties signed on July 13, 2005, is a binding agreement, either for the sale of the station or for requiring the parties to negotiate exclusively and in good faith. Plaintiff does not specifically claim that the letter of intent was a binding contract for the sale of the station. However, it does claim that defendants were bound by the letter of intent to negotiate exclusively and in good faith. It claims that their breach of this duty, along with the certainty and definiteness of the terms of the letter, allows plaintiff the relief of an injunction

that would prevent defendants from selling the station to Entravision, and requires the letter of intent to be specifically performed. "In order to state a cause of action for specific performance of a contract, it is necessary that an enforceable contract exist." Chicago Investment Corp. v. Dolins, et al., 93 Ill. App. 3d 971, 974, 418 N.E.2d 59 (Ill. App. Ct. 1981). Therefore, for the purposes of specific performance, we must first determine if the letter of intent was a binding contract for the sale of the station.

In Illinois, letters of intent may be enforceable. However, such letters are not necessarily enforceable unless the parties intend them to be contractually binding. Interway, Inc. v. Alagna, et al., 85 Ill. App. 3d 1094, 1098, 407 N.E. 2d 615 (Ill. App. Ct. 1980). This is because Illinois law recognizes the prerogative of parties to agree to further negotiations, while reserving the right to back out of a pending deal prior to the occurrence of some later event. Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 432 (7th Cir. 1993). The parties decide for themselves whether to be bound by such letters, and they do so by the terms of the letter itself. Ocean Atlantic, 322 F.3d at 996 (citing Abbot Lab. v. Alpha Therapeutic Corp., 164 F.3d 385, 387 (7th Cir. 1999)). A letter of intent that refers to a subsequent formal agreement does not necessarily defeat the parties' intent to be bound. Glenview Partners v. Plexus Corp., 2002 WL 1052040 at *2 (N.D. Ill. 2002). However, language that reflects a tentative agreement contingent upon the successful completion of negotiations that are ongoing, does not amount to a contract that binds the parties. Ocean Atlantic, 322 F.3d at 996. Thus, a determination of intent is based on objective, rather than subjective, manifestations of the parties. A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc., 678 F. Supp. 193, 195 (N.D. Ill. 1988)(Apothekernes I) aff'd 873 F.2d 155 (7th Cir. 1989)(Apothekernes II). We therefore must determine whether the parties here intended to be

bound by this letter of intent.

"Courts look to all of the circumstances surrounding the negotiations, including the actions of the principals both during and after, to determine what the parties intended." Apothekernes II, 873 F.2d at 157. First, it is clear that the parties did not intend for the letter of intent to be a binding contract for the sale of the television station. The document itself states that it is a "non-binding letter of intent" which "represents the fundamental terms and conditions under which [defendants are] prepared to enter into a Stock Purchase Agreement" with plaintiff. The word "prepared" occurs twice in this letter, which signifies a future intent, rather than a present one. See AMERICAN HERITAGE DICTIONARY (4th ed. 2004)("to make ready beforehand for a specific purpose").

Additionally, while the letter includes some terms of the proposed agreement, it does not cover a majority of terms "one would expect to find in a multi-million dollar contract for the sale" of a television station, such as warranties and representations, closing procedures, taxes, forms of notice, or a liquidated damages clause – all of which were included in the 70-page draft SPA. See Ocean Atlantic, 322 F.3d at 999. The Illinois Supreme Court has held that "the absence of certain terms in the letter indicates the parties' intent not to be bound by the letter." Quake Construction, Inc. v. American Airlines, Inc. et al., 141 Ill. 2d. 281, 295, 565 N.E. 2d 990 (Ill. 1990).

Furthermore, the letter of intent contained an exclusive negotiation provision which required, upon signing, for the defendants to refrain from entertaining offers from third parties. If the parties believed this letter of intent was a binding contract for the sale of the station, this provision would be superfluous, as there would be no possibility of entertaining other offers for a station that was already contracted to be sold.

If the language of the letter itself was not sufficient, the conduct of the parties supports the conclusion that neither party intended the letter to be a binding contract for the sale of the station. The plaintiff's initial letter offer to defendant contemplated the sale of the station would be "subject, of course, to" not only "FCC and other necessary regulatory approvals," but also to "the terms of a customary definitive" SPA (plf's cplt., exh. A). Our courts have found that a "subject to" clause "clearly evinces" an intent not to be bound until a definitive written agreement has been executed. Venture Associates, 987 F.2d at 432-33. Although the "subject to" clause is missing from the letter of intent itself, the language mimics the letter offer in the preparation of a "definitive" SPA, along with the need to prepare FCC applications for approval.[3]

The subsequent conduct of the parties also supports our conclusion. Both the draft and the signed escrow agreements specifically state that the parties had "entered into a non-binding letter of intent regarding" purchase of the station (plf's response, exhs. I and P). The August 11, 2005, e-mail from plaintiff's counsel, which contained the draft escrow agreement, similarly called the letter of intent "non-binding" (plf's response, exh. L). Therefore, it is clear that neither the plaintiff nor the defendants intended the letter of intent to be a binding contract for the sale of the station.

Because we find that the letter of intent did not constitute a binding contract for the sale of TV-49, plaintiff's claims for injunction and specific performance must fail as a matter of law. Therefore, we grant defendants' motion for summary judgment as to Counts I and II of the complaint.

---

[3] Our courts have held that the "absence of a 'subject to' clause [does not] carry talismanic significance. The parties may through other means make clear that they do not intend to be bound until a contract is executed." Ocean Atlantic, 322 F.3d at 999.

## Duty to Negotiate Exclusively and in Good Faith

Whether the letter of intent created a duty for the parties to negotiate exclusively and in good faith is a closer question. The Seventh Circuit has held that a letter of intent that is found to be non-binding in its terms, may nevertheless create a binding obligation for the parties to negotiate in good faith. A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc., 873 F.2d 155 (7th Cir. 1989) However, there is little Illinois case law on this issue, and most of the jurisprudence in this area has come from our federal courts. Therefore, while we are unsure of what the Illinois courts would do in this area, we follow the guidance of the Seventh Circuit in the absence of a clear directive by the state courts.

The Seventh Circuit first recognized, albeit in dicta, in Chase v. Consolidated Food Corp., 744 F.2d 566, 571 (7th Cir. 1984), the possibility of a binding obligation to negotiate in good faith from an otherwise non-binding letter of intent. The court gave a more in-depth treatment in Feldman v. Allegheny Int'l, Inc., 850 F.2d 1217 (7th Cirl. 1988). There, the parties had signed a letter of intent stating that it was not binding, and that the obligations of the parties would be set forth in the definitive agreement to be executed at a later date. The letter did, however, commit the seller, Allegheny, on behalf of Sunbeam, not to negotiate with another party while the proposed acquisition was being pursued. In affirming the district court's directed verdict for the defendant, the Seventh Circuit held that the letter of intent was not a binding contract for the sale, but "may give rise to some enforceable obligation, in particular, the right to some degree of exclusive bargaining for some time." *Id.* at 1224. However, this right only lasted as long as the acquisition was being pursued. *Id.* at 1223. Thus, the court found that it was not much of an obligation at all since, by the terms of the letter, either party could cut off negotiations at any time. *Id.*

The court invoked <u>Feldman</u> in <u>A/S Apothekernes</u>, 873 F.2d 155, which affirmed an opinion of this court. 678 F.Supp. 193 (N.D. Ill. 1988). In that case, the parties had signed a letter of intent which was "subject to" the signing of a binding purchase agreement that was to be executed within 60 days of the signing of the letter. The letter then stated that the seller "agrees not to initiate negotiations or discussions intended to lead to negotiations with others for the sale of these same assets." *Id.* at 156. We held that the letter did not create a binding contract, but did create a binding agreement to negotiate exclusively and in good faith. 678 F. Supp. at 197. Our opinion had analyzed the state court law available and concluded that, based on analogous precedent, the state courts would recognize such a duty. *Id.* However, we held that the duty only arose during the 60 days laid out in the letter for the signing of the purchase agreement, and that during that time the parties did so negotiate and therefore there was no triable issue of fact. 873 F.2d at 156. The Seventh Circuit agreed, holding that, like in <u>Feldman</u>, the scope of such a duty could only be determined "from the terms of the letter itself," and not from any common law principles. *Id.*

Subsequent cases in our courts have similarly found the existence of a duty to negotiate in good faith in an otherwise non-binding letter of intent. *See* <u>Venture Associates Corp. v. Zenith Data Systems Corp.</u>, 987 F.2d 429 (7th Cir. 1993); <u>Chicago Search Group, Inc. v. Indevo A.B. & Indevo N.A. Inc.</u>, 1991 WL 90956 (N.D. Ill. 1991); <u>Berco Investments, Inc. v. Earle M. Jorgenson, Co.</u>, 861 F. Supp. 705 (N.D. Ill. 1994); <u>Midwest Mfg. LLC v. Donnelly Corp.</u>, 975 F. Supp. 1961 (N.D. Ill. 1997); <u>Tan v. Allwaste</u>, 1997 WL 337207 (N.D. Ill. 1997); and <u>Jamsports & Entertainment LLC v. Paradama Productions, Inc.</u>, 336 F. Supp. 2d 824 (N.D. Ill. 2004). At least one Illinois appellate court has agreed with our circuit on this issue. *See* <u>Milex Products, Inc. v. Alra Laboratories, Inc.</u>, 237 Ill. App. 3d 177 (Ill. App. Ct. 1992). While some of our cases

have relied on the explicit nature of such an obligation in the letter *(see e.g.* Venture Assoc., 987 F. 2d 429 (letter non-binding "except for" duty to negotiate in good faith); Berco Investments, 861 F. Supp. 705 (letter non-binding, "nevertheless" parties agreed to negotiate in good faith); Chicago Search, 199 WL 90956 (letter non-binding except for certain explicit paragraphs); Jamsports, 336 F. Supp. 2d 824 (letter non-binding except for certain explicit provisions)), others, including the one decided by this court, have not. *See* A/S Apothekernes, 678 F. Supp. 193 *aff'd* 873 F.2d at 156; Feldman, 850 F.3d at 1219; Tan, 1997 WL 337207 at *1.

Based on the above precedent, and on a fair reading of the letter of intent in this case, we find that the parties did intend the letter of intent to bind them to exclusive and good faith negotiations. Defendants argue that the letter is not binding in its entirety because the phrase "non-binding letter of intent" is not limited to one specific term or provision, but encompasses the entire letter (def. reply, at 6). We do not agree. The phrase defendants refer to occurs in a paragraph introducing the terms upon which defendants were prepared to sell the station. This paragraph ends with a colon and following that colon are paragraphs setting out all the general terms of the potential sale. These headings include "Purchase Price," "Deposit," and "Timing." The next paragraph begins with the phrase: "Should the above terms be acceptable to Weigel ...." Reading the letter as a whole, it is clear that the non-binding clause refers only to the terms set out after the colon.[4] After those terms are set forth, the letter concludes that if those terms are satisfactory to Weigel – indicated by Weigel's signing of the document – defendants would "cease all negotiations to sell to any other party and not enter into or entertain any such similar negotiations pending completion of a definitive and binding SPA."

---

[4] Defendants agree that the non-binding clause applies to everything after the colon. However, they argue that this includes the paragraph regarding the duty to negotiate exclusively (def. reply, at 7).

We find support for this conclusion in that the language of the exclusivity clause is taken verbatim from the plaintiff's letter offer, which predicated going forward with the sale on defendants providing written assurance of exclusivity.[5]

This duty to negotiate exclusively, however, was governed by the terms set forth in the letter of intent, requiring a definitive SPA to be drafted and executed within 40 days from the date of signing – a time frame ending on August 23, 2005. Since the exclusivity provision was to continue until the definitive SPA was completed, and since this had to be done in the 40-day window, it follows that the parties were bound to the exclusivity provision within those 40 days.[6] This follows from similar holds of cases in our circuit. *See* A/S Apothekernes. 678 F. Supp. 193 *aff'd* 873 F.2d 155(duty to negotiate exclusively and in good faith limited to 60-day period set forth in letter); Berco, 861 F. Supp. 705 (duty to negotiate in good faith extended until execution of agreement, and parties did so negotiate during that time period); Midwest Mfg., 975 F. Supp 1061 (duty to negotiate exclusively only lasted during the life of the letter of intent); Jamsports, 336 F. Supp. 2d 824, at 198 (duty to negotiate exclusively and in good faith limited to the 90 days set out in the letter).

Similarly, in this case, defendants were relieved of their duty to negotiate exclusively and in good faith after the 40-day time period expired. However, it remains a question of whether defendants did so negotiate during the relevant period from July 13, 2005 until August 23, 2005.

---

[5]That part of the letter offer states as follows: "If the terms outlined above are acceptable to the Sellers and they provide...(2) written assurance that they have terminated negotiations to sell the Stations to any other party and will not enter into or entertain such similar negotiations pending completion of a definitive and binding APA with Weigel, we should proceed as follows..." (plf's.cplt, exh A).

[6]Defendants argue that even if there was a binding agreement to negotiate in exclusively and in good faith, that agreement was indefinitie in scope after the 40-day time frame, and therefore could be terminated at will, and was so terminated when plaintiff informed defendants on September 22, 2005, that it would no longer pursue the deal if defendants did not make the channel election for channel 49 (def. mot. for sum. jdgmt, at 14-15). However, because we find the relevant time frame to be only until August 23, 2005, we need not address this argument.

Plaintiff has alleged that defendants acted in bad faith during the relevant time period by failing to provide necessary paperwork during plaintiff's due diligence investigation. Good faith is a question of fact (Jamsports & Entertainment, LLC v. Paradama Productions, Inc., 336 F. Supp. 2d 824 (N.D. Ill. 2004), and because discovery thus far has been limited we are unable to say, as a matter of law, that defendants acted in good faith. Therefore, summary judgment is inappropriate and we deny defendants' motion for summary judgment as to counts III and IV of the complaint.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to counts I and II of the complaint, and denied as to counts III and IV.

JAMES B. MORAN
Senior Judge, U. S. District Court

Nov. 29, 2006.